# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHARON J. RHODEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:14-0411 |
| | ) | **Electronic Filing** |
| CHILDREN'S HOSPITAL OF PITTSBURGH | ) | |
| OF THE UPMC HEALTH SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

September 22, 2017

**I.  INTRODUCTION**

This matter is before the court upon a Motion for Summary Judgment filed by Defendant Children's Hospital of Pittsburgh of the UPMC Health System ("Defendant" or "Children's Hospital") (ECF No. 73). For the reasons that follow, Defendant's Motion will be granted.

**II.  FACTUAL BACKGROUND**

The plaintiff, Sharon Rhoden ("Plaintiff"), is a black adult female who was born in Jamaica. Defendant's Concise Statement of Undisputed Material Facts ("DSMF") (ECF No. 75) ¶ 1-3. Defendant is a pediatric hospital located in Pittsburgh, Pennsylvania, dedicated solely to the care of infants, children, and young adults. Id. ¶ 5.

Plaintiff commenced employment with Defendant as a Pharmacy Technician in July of 1980. Id. ¶ 13. From approximately 1985 to 1990, Plaintiff took classes to obtain a Bachelor of

Science degree in pharmacy. Id. ¶ 14. Defendant hired Plaintiff as a full-time pharmacist in 1990. Id. ¶¶ 18-19.

Defendant utilizes a progressive, four-step Corrective Action and Discharge Policy (the "Policy") to govern employee conduct. Id. ¶ 7. Under the Policy, the first step of discipline is a verbal warning, followed by a written warning (Step 2), a final written warning (Step 3), and ultimately termination (Step 4). Id. ¶ 8. Defendant also reserves the right to immediately terminate employees who commit egregious violations of hospital policy. Id. ¶ 9.

On August 2, 2010, Plaintiff received a verbal warning from her supervisor, Joseph Mazzotta ("Mazzotta"), based on an award nomination submitted by Plaintiff that contained language allegedly disparaging another employee. Id. ¶ 39. Plaintiff had nominated Defendant's Human Resources Consultant, Terry Devin, for an Award for Commitment and Excellence in Service ("ACES") on May 22, 2010. Id. ¶ 31. Plaintiff's nomination included the declaration that: "One realizes what a treasure [Devin] is when one has to deal with unscrupulous representatives who attempt to stand in her footsteps." Id. Defendant interpreted this language as an attempt to disparage and criticize another Human Resources Consultant, Marsha Campbell. Deposition of Joseph Mazzotta ("Mazzotta Depo.") (ECF No. 76-3) at 18-19. Plaintiff denied that her comments were directed at Campbell. DSMF ¶ 37.

On May 14, 2012, Plaintiff left her work station to use the restroom. Id. ¶ 41. A dispute arose between Plaintiff and another pharmacist, Fred Mohrbacher, concerning the amount of time it took for Plaintiff to return to her station. Id. ¶¶ 44-47. Plaintiff maintained that Mohrbacher was loud and rude in demanding that she return quickly so that he could leave work for a doctor's appointment, whereas Mohrbacher believed that Plaintiff intentionally malingered so as to make him late. Id. ¶¶ 45-47; Plaintiff's Response to Defendant's Concise Statement of

2

Undisputed Material Facts ("PRSMF") ¶¶ 45-47. Mazzotta investigated the incident and obtained written statements from several pharmacy employees who described Plaintiff's behavior as unprofessional and rude. DSMF ¶¶ 51, 54. Plaintiff contended that each of those employees was lying. PRSMF ¶ 55.

In the meantime, another pharmacist, Janice Cottone, sent an email to the entire staff reminding them of the duties associated with a particular pharmacist position and explaining that the last person to serve in that position had not fully completed those duties. DSMF ¶ 58. Believing that this email was referring to her, Plaintiff sent a "reply all" email defending the work that she had performed on the previous day and explaining that her shift had been short-staffed. Id. ¶ 59. Another pharmacist, Mark Womeldorff, responded with his own "reply all" email in which he objected to Plaintiff's characterization of the staffing situation. Id. ¶ 61. Mazzotta responded to both emails by warning all pharmacists to "be mindful" of using "reply all" when sending emails. Id. ¶ 62.

As a cumulative result of the restroom incident and the email incident, Mazzotta issued Plaintiff a Step Two written warning. Id. ¶ 65. Plaintiff responded by filing a charge with the United States Equal Employment Opportunity Commission ("EEOC") on October 27, 2012. Id. ¶ 69.

Plaintiff received a final written warning (Step Three) on August 28, 2013. Id. ¶ 96. That warning stemmed from an incident that occurred on August 16, 2013, at which time Plaintiff was observed speaking on her cell phone during work hours for approximately 20-25 minutes in violation of Defendant's Cellphone Policy. Id. ¶¶ 77. Jeffrey Goff, the pharmacy director, ultimately issued the final written warning after concluding that Plaintiff's explanation for her cell phone use was not credible. Id. ¶¶ 92. Plaintiff contends that her cell phone use was

no more egregious than that of other employees and that her cell phone use was justified by a medical issue that had allegedly arisen with her mother (to whom she was speaking). PRSMF ¶¶ 88-95.

On October 20, 2013, a Medical Delivery Assistant, Sarah Boarts, sent an email to Goff and Mazzotta accusing Plaintiff and another pharmacist, Tammy Wurst, of each refusing to take a phone call from the Pediatric Intensive Care Unit. Id. ¶¶ 107-08. Pursuant to Defendant's call routing policy, pharmacists are assigned a specific floor of the hospital from which they are responsible for accepting calls. Id. ¶¶ 104-05. If a pharmacist is too busy to take a call from his or her assigned floor, the pharmacist is responsible for making sure the call is re-routed to another pharmacist. Id. ¶ 105. In her email, Boarts explained that Plaintiff and Wurst each refused to take the call despite the fact that neither of them was on the phone handling other requests at that time:

> The PICU called and asked to speak with a pharmacist. I placed the nurse on hold and asked [Plaintiff] to speak with her, but she refused to take it. [Plaintiff] claimed she felt she was doing all the work and asked me to have someone else take the call. The entire afternoon was fairly slow, so no one person was actually being given an exceptionally larger workload. . . . I asked the group at large for someone to take the call; [Wurst] refused because it was supposed to be [Plaintiff's] floor. About two minutes later, the nurse from PICU was still on hold. [Another pharmacist] ended her phone call and picked up the PICU line, resolving the issue herself . . .

Id. ¶ 108.

Plaintiff explained that, although she was not on the phone at the time, she was busy completing a backlog of tasks stemming from prior calls and was too occupied to answer the call. PRSMF ¶ 109, 112. Plaintiff asserts that her supervisor, Mazzotta, had instructed her that it was appropriate to refuse a call in circumstances where her she had a backlog of cases. Id. ¶ 112. Despite this explanation, Defendant concluded that Plaintiff's refusal to take a call from the

4

PICU constituted a knowing and intentional failure to provide adequate patient care and violated Defendant's policies and mission statement. DSMF ¶ 116. As a result, Goff, Mazzotta, and Defendant's human resources department made the decision to terminate Plaintiff's employment on October 25, 2013. Id. ¶ 117. Wurst, a Caucasian, was also terminated for refusing to take the same phone call. Id. ¶ 118.

Based on her discharge, Plaintiff filed a charge with the EEOC on May 1, 2014. Id. ¶ 119. She initiated the instant lawsuit on March 28, 2014. Compl. (ECF No. 1). Following the EEOC's dismissal of her charge, Plaintiff filed an amended complaint alleging that Defendant had unlawfully discriminated and retaliated against her on the basis of her race, national origin, and age. Am. Compl. (ECF No. 16). She withdrew her age-based discrimination claims in response to Defendant's motion for summary judgment. Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Pl. Resp.") (ECF No. 78). Her remaining claims form the basis for the instant motion for summary judgment.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially

on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. Celotex Corp., 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Id. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

IV. **DISCUSSION**

A. Discrimination Based on Race and National Origin

Plaintiff first alleges that Defendant unlawfully terminated her on the basis of her race and national origin in violation of Title VII of the Civil Rights Act of 1964, 29 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq*. Title VII's anti-discrimination provision, codified at 42 U.S.C. § 2000e-2(a), makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

6

origin ...." 42 U.S.C. § 2000e-2(a). The PHRA similarly declares it to be an "unlawful discriminatory practice" for an employer to discharge or otherwise discriminate against an individual "with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required." 43 PA. CON. STAT. ANN. § 955(a).

Although the PHRA is a statute of independent force under Pennsylvania law, it has generally been construed to be coextensive with its federal counterparts. Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996). Because the scope of protection provided under the PHRA is not materially different from that provided under Title VII, the Court's analysis of Plaintiff's Title VII claims is applicable to her claims under the PHRA.

In order to establish a *prima facie* case of discrimination, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position that he held; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of unlawful discrimination. Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 1999). Here, Defendant does not challenge that Plaintiff is a member of a protected class, was qualified for the position that she held, and was subjected to an adverse employment action. Rather, Defendant maintains that Plaintiff was terminated pursuant to Defendant's four-step Corrective Action and Discharge Policy on the basis of her own misconduct. Defendant contends that Plaintiff's disrespectful and unprofessional interactions with co-employees, inappropriate use of her email and cell phone, and refusal to take an assigned call from the PICU cumulatively serve to vitiate the fourth element of her *prima facie* case and serve as a legitimate, non-discriminatory justification for her termination.

Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the McDonnell Douglas–Burdine burden-shifting framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the analysis. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). For present purposes, the Court will address the evidence adduced by Plaintiff in the context of pretext because his burden at the *prima facie* stage is "much less onerous than proving pretext with similar evidence." Opsatnik v. Norfolk Southern Corp., 2008 WL 763745, at *4 (W.D. Pa. Mar. 20, 2008), *aff'd*, 335 F. App'x 220 (3d Cir. 2009) (citing Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998)). See also Moussa v. Penn. Dept. of Public Welfare, 2010 WL 1333333, at *8 (W.D. Pa. Mar. 31, 2010) (analyzing the plaintiff's claims at the pretext stage where the defendant's *prima facie* and pretext-based arguments each relied on the same evidence).

In the instant case, Defendant's articulated reason for its decision to fire Plaintiff was that she refused to answer a phone call from Defendant's PICU, jeopardizing the quality of care provided to Defendant's most vulnerable patients. In reaching its decision, Defendant relied on the following description of the incident supplied by Boarts:

> [A] nurse called the inpatient pharmacy between approximately 1 and 1:30 PM. . . . I turned to Sharon and asked if she would please speak to a nurse from PICU. She replied that she was "too busy to take the call," it was unfair that she was doing all the work, she felt as though she was being singled out, and to "tell someone else to take care of it." She then sat down at her computer within reach of the phone. She glanced at her left at the call still on hold, looked at me, shrugged and told me again to pass it to someone else.

8

ECF No. 81-1. According to Boarts, the nurse remained on hold while Plaintiff and Wurst engaged in a stalemate over who would take the call. Id. Boarts noted that "[t]he entire afternoon was fairly slow, so no one person was actually being given an exceptionally larger workload." Id. Defendant supports its termination decision by noting that Plaintiff had previously received a verbal warning, written warning, and final written warning, as specified by Defendant's four-step Corrective Action and Discharge Policy.

To defeat Defendant's motion for summary judgment, Plaintiff must point to some evidence that might cause a factfinder to either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000). It is not enough to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting Fuentes, 32 F.2d at 765). In other words, Plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller, 130 F.3d at 1109. She may do so by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Fuentes, 32 F.3d at 765 (quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)) (internal citations omitted).

Plaintiff attempts to meet this burden in two ways. First, she contends that Wurst, a Caucasian employee who did not share Plaintiff's protected characteristics, was treated more favorably by the Defendant after the incident. However, the record clearly reflects that Wurst was also terminated for her refusal to take the same phone call. Although Plaintiff suggests that Wurst's situation is dissimilar because she committed a separate, discrete offense on the same day – a delay in delivering medication – there is nothing in the record to suggest that Wurst would not have been independently terminated for either event. See Ezold v. Wolf, Block, Schorr and Solis–Cohen, 983 F.2d 509, 531 (3d Cir.1992) (A "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon . . . ."). Moreover, even if Wurst's behavior was more egregious than Plaintiff's, that would not render Defendant's articulated reason for Plaintiff's termination "unworthy of credence." Fuentes, 32 F.3d at 765. To the contrary, the evidence of record suggests that both employees committed terminable offenses of varying severity and were terminated for those offenses.

Plaintiff next contends that she should not have been terminated because she was following the standing orders of her supervisor, Mazzotta, when she declined to take the phone call from the PICU nurse. According to Plaintiff, at the time of the incident, she was "overwhelmed" with a backlog of work from calls that she had already taken. Rhoden Depo. (ECF No. 81-1) at 270-71. She asserts that Mazzotta had specifically instructed her to defer telephone calls to other pharmacists in such circumstances. Id. at 270-71, 276. Even if this is true – which is unclear from the record – it is axiomatic that a plaintiff cannot survive summary judgment simply by alleging that her employer's decision "was wrong or mistaken" or that the employer acted in a manner that was not "wise, shrewd, prudent, or competent." Keller, 130

10

F.3d at 1108-09. Rather, she must show that "discriminatory animus motivated the employer." Id. The fact that Plaintiff disagrees with her employer's rationale for her termination or disputes the underlying facts behind that decision is not enough to establish that the employer's rationale was implausible or discriminatory. See, e.g., Meyer v. Callery Conway Mars HV, Inc., 2015 WL 65135, at * 12 (W.D. Pa. Jan. 5, 2015) ("The correctness of [defendant's] decision . . . is not what matters. . . . The existence or absence of discrimination does not turn on the ultimate truth or falsity of the information relied upon by an employer as a basis for making an employment decision.") (citing Daniels v. Sch. Dist. of Phila., 982 F.Supp.2d 462, 487 (E.D. Pa. 2013)); Keller, 130 F.3d at 1109 (emphasizing that the critical issue is not whether the evidence supporting the defendant's decision is conflicted, but whether the evidence so clearly fails to support that decision that the defendant could not truthfully have believed otherwise). After all, a "wrong decision" based on incorrect information "cannot be equated with a discriminatory decision." Meyer, 2015 WL 65135, at * 12. Simply put, Plaintiff has failed to adduce sufficient evidence that the defendant's decision "was so clearly unfounded that it cannot have been sincere," Keller, 130 F.3d 1108-09, or that it was compelled by discriminatory animus. Stanziale, 200 F.3d at 105. Because no reasonable jury could conclude that Defendant's stated rationale for Plaintiff's termination was a pretext for unlawful discrimination, summary judgment on this claim is warranted.

B. Retaliation

Plaintiff next contends that she suffered a retaliatory discharge in violation of Title VII and the PHRA after filing a discrimination charge with the EEOC on October 27, 2012.[1] To state a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in a protected

---

[1] Because "the proper analysis under Title VII and the {PHRA] is identical," the Court's analysis applies equally to both claims. Weston v. Pennsylvania, 251 F.3d 420, 425 n. 3 (3d Cir. 2001).

activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006). The United States Supreme Court has emphasized that Title VII retaliation claims must ultimately be proven according to "traditional principles of but-for causation." Univ. of Texas Southwestern Medical Center v. Nassar, __ U.S. __, 133 S.Ct. 2517, 2533 (2013).

Consistent with this principle, Plaintiff cannot survive summary judgment unless she can produce evidence from which a reasonable factfinder could conclude that her EEOC charge was the but-for cause of her termination. A careful examination of the record reveals that she has failed to satisfy this burden.

Plaintiff first contends that the amount of time between her protected activity and her ultimate termination is highly suggestive of retaliation. It is well-established that the temporal proximity between a protected activity and an adverse employment action may provide some inference of a causal connection where the proximity is "unusually suggestive of retaliatory motive." Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000). However, Plaintiff filed her discrimination charge in October 2012, almost one year prior to her termination. Courts have routinely found causation lacking in situations where far shorter temporal gaps separated the protected activity from the adverse employment action. See, e.g., C.M. v. Bd. of Educ., 128 F. App'x 876, 883 (3rd Cir. 2005) (finding that a three month gap between protected activity and adverse employment action was too broad to support causation); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760-61 (3rd Cir. 2004) (two month gap did not support inference of

causation); Yeager v. UPMC Horizon, 698 F. Supp. 2d 523, 50 (W.D. Pa. 2010) (seven month gap suggested lack of causation).²

Where the temporal proximity is not unusually suggestive, "a court may consider whether the record evidence, as a whole, is sufficient to raise an inference of causation." Kahan v. Slippery Rock Univ. of Pennsylvania, 50 F. Supp. 667, 701 (W.D. Pa. 2014). Such evidence may include "evidence of ongoing antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." Id. (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)). In this instance, however, Plaintiff concedes that her working conditions and the alleged "harassing and discriminatory conduct" that she faced actually improved after she filed her discrimination claim. Am. Compl. ¶ 18. Moreover, although she cites several examples of allegedly discriminatory remarks made by co-workers, each of those incidents occurred several years prior to her filing of the EEOC charge in 2012. PRSMF ¶¶ 168-172. Finally, the record reflects that Plaintiff received an "excellent" review in June 2013, eight months after filing her EEOC charge. DSMF ¶ 71; PRSMF ¶ 71. See Tahiliani v. Bayer Corp., 170 F. App'x 215, 216 (3d Cir. 2006) (noting that it would be "illogical" to believe that a company would refrain from retaliating after the filing of an EEOC charge, issue a favorable employee evaluation in the meantime, and then change course and elect to retaliate at a much later date). In short, there is nothing in the record that would enable a factfinder to adduce

---

² Plaintiff also complained in an August 2013 email about being "singled out" for punishment over the cell phone incident. However, Plaintiff's email fails to allege in any manner that she thought she was being mistreated because of her race or national origin. ECF No. 81-1. Moreover, even if this email could be construed as protected activity for purposes of Title VII, the two month gap between that email and her termination is still too large to suggest causation on its own. Williams, 380 F.3d at 760-61 (two month gap did not support inference of causation); see also Booze v. Wetzel, No. 13-2139, 2015 WL 5173937, at *15 (M.D. Pa. Sep. 2, 2015) (noting, in the context of retaliation, that the Third Circuit's jurisprudence "suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.").

13

that Plaintiff's EEOC charge spurred "a pattern of antagonistic behavior" that culminated with her retaliatory termination. McCann v. Winslow Twp., 299 F. App'x 149, 152 (3d Cir. 2008).

## V. CONCLUSION

The Court finds that there are no material facts in dispute; Plaintiff is unable to show that that the Defendant violated her rights under Title VII or the PHRA. Accordingly, the Defendant's motion for summary judgment shall be granted. An appropriate order follows.

s/ David Stewart Cercone  
David Stewart Cercone  
United States District Judge

cc: Danielle M. Parks, Esquire
Nelson D. Berardinelli, Esquire
Martell Harris, Esquire
Christi M. Wallace, Esquire
Joanna M. Rodriguez, Esquire
Dean F. Falavolito, Esquire

(*Via CM/ECF Electronic Mail*)